## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALEX FERRARI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. ___2:23-cv-1541___ |
| | ) | |
| MATTHEW FERRARI, | ) | |
| | ) | |
| Defendant. | ) | JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff Alex Ferrari ("Alex" or "Plaintiff"), files this Complaint against Matthew Ferrari

("Matthew" or Defendant") (together with Plaintiff, the "Parties") and avers as follows:

## INTRODUCTION

1.      Plaintiff brings this minority shareholder oppression/squeeze-out and breach of

fiduciary duties action against Defendant to obtain statutory and common law remedies and

damages (*see* Paragraph 65), including the purchase of his minority shares at fair value and

compensatory and punitive damages resulting from Defendant's willfully unfair and oppressive

conduct while in majority ownership and control of Ferrari Importing Company, Inc., a/k/a

Ferrari Importing, Inc., a/k/a Gamma Sports, a Michigan corporation (the "Company").

Plaintiff's claims are asserted under the Michigan shareholder oppression statute, MCL 450.1489

(the "Oppression Statute" or "Section 1489"), and the common law. Section 1489 provides for

comprehensive equitable and legal remedies for violation of the statute and grants the Court

significant discretion to "make an order or grant relief as it considers appropriate" including

multiple enumerated remedies.

2.      The Parties are the only children of Harry F. Ferrari ("Harry") and Velma Ferrari

("Velma") (together, the "Parents"). The Parents built the Company after many decades of hard

work and meant for their sons to share equally in the benefits of the Company, similar to the 50-50 split they planned for them in their estate plans. In approximately 2005, Harry appointed Matthew CEO of the Company. At all times thereafter, Harry imposed reasonable limits on Matthew's compensation and benefits and resisted Matthew's repeated requests and attempts to obtain higher and unreasonable levels of compensation and benefits. Harry also gave Alex a position with the Company that allowed him to be paid a small salary and benefits since Alex's primary occupation was outside the Company. While Harry was alive, he and his sons served as Directors and made all of the important decisions together. In a letter to his sons, just before his death, Harry implored Matthew: "Please make sure that Alex is treated fairly." Harry's concern that Matthew would turn on Alex after he died was well-founded, as described below.

3.      Beginning shortly after Harry's death in 2016 and continuing through and after Velma's death in early 2020, Matthew has breached his fiduciary duties to Alex and wrongfully and willfully unfairly oppressed and squeezed out Alex in multiple ways while exercising control over the Company, including taking the following actions, which are set forth in more detail below:

a.  Dramatically increased Matthew's own salary and benefits, and the salary and benefits of favored employees, to levels far in excess of reasonable amounts, without Alex's knowledge and/or approval. Matthew's excessive compensation and benefits constitute de facto dividends disproportionately paid to Matthew;

b.  Terminated Alex's employment with the Company and eliminated Alex's salary and benefits;

c.  Terminated tax and other distributions to the Shareholders, including distributions necessary to pay taxes on Subchapter S-allocated profits;

d.  Caused the Company to incur losses and/or realize only nominal amounts of income due to the payment of excessive compensation and benefits to himself and favored Company employees;

e.  Failed to have regular Shareholder meetings and Board of Directors meetings as required by the Company's Bylaws and resisted Alex's requests for such meetings, as part of his plan to prevent Alex from meaningfully participating in corporate governance and learning about material transactions involving the Company, and refusing to prepare or approve minutes of meetings;

f.  Failed to submit material Company transactions and agreements to the Board of Directors for review and approval, including multi-million dollar related party loans and a $2 Million loan with Citizens Bank;

g.  Obtained the $2 Million loan from Citizens Bank over Alex's objection and falsely representing to the bank that the Board of Directors had approved the loan;

h.  Withholding and significantly delaying the production of business records and information after repeated promises to produce such information and records, and demanding that Alex pay costs associated with obtaining records despite Alex's position as a shareholder, Director and Officer of the Company and his statutory right to examine the Company's books and records;

i.  Causing the Company's records for certain relevant years to become inaccessible for review, in order to hide his conduct and make it difficult for Alex to discover his wrongful misconduct;

j.  Lashing out and threatening Alex with "personal and professional" repercussions when he (Alex) made inquiries about the Company and/or retained his own counsel and/or

scheduled Shareholder and/or Directors meetings, including threatening Alex that he (Matthew) owns guns to protect himself from anyone trying to harm him financially;

k.  Misusing Company funds for the payment of personal expenses to support a lavish lifestyle; and

l.  Self-dealing and diverting corporate opportunities, including negotiating more favorable terms for his own loans to the Company compared to the terms of similar loans made to the Company by related entities and repaying himself before other creditors by borrowing from Citizens Bank at higher interest rates

(collectively, the "Wrongful Conduct").

4.  The Wrongful Conduct is actionable minority shareholder oppression because it is "illegal, fraudulent and/or willfully unfair and oppressive" to Alex and the Company and has caused harm and damages to both Alex and the Company. *See* Section 1489. Such Wrongful Conduct constitutes "a continuing course of conduct or a significant action or series of actions that substantially interferes" with Alex's interests as a minority shareholder of the Company. *Id*. Matthew's termination of Alex's employment and benefits wrongfully interferes with distributions and other shareholder interests disproportionately as to Alex. *Id*. None of the Wrongful Conduct is permitted by any agreement, Bylaws, articles of incorporation, policy or other corporate document or action. *Id*. To the contrary, such conduct is prohibited by the Company's Bylaws, policies and the prior course of conduct and agreements involving the Company.

5.  The Wrongful Conduct is also a breach of Matthew's fiduciary duties to Alex as a minority shareholder.

6.      Matthew has recently expressed his position to Alex that he is untouchable and not answerable to anyone.

## THE PARTIES AND THE COMPANY

7.      Alex is an adult individual who resides in Glendale, CA 91206. At all relevant times herein, Alex was and is a minority shareholder of the Company and currently owns 49.53% of the outstanding stock. Alex is the younger brother of Matthew. Alex has been a Director of the Company since approximately 2005 and Secretary since at least 2016.

8.      Matthew is an adult individual who resides in Pittsburgh, PA. Prior to the death of their father Harry in 2016, Matthew was a large minority shareholder of the Company and had worked in the Company since approximately the mid-1990s. In approximately 2005, Harry turned over day-to-day control of the Company to Matthew. After Harry's death, Matthew became a majority shareholder of the Company and currently owns 50.47% of the outstanding stock. Since Harry's death in 2016, Matthew has controlled all of the operations and affairs of the Company. Matthew has been a Director of the Company since approximately 2000.

9.      The Company is a Michigan corporation organized on or about February 13, 1963, by Harry and his brother Roy Ferrari. The Company's main office and warehouse is located in Pittsburgh, PA. The Company's business involves the importation and sale of tennis racquets, racquets for other sports, pickleball supplies, and tournaments and sports merchandise. In 1987, the Company adopted Subchapter S status for tax purposes, which results in the passing of income and losses and other tax attributes to the shareholders who must report such income and losses on their personal income tax returns and pay applicable taxes even if the Company makes no distributions. The Company's internal affairs are governed by Bylaws dated July 31, 2012.

## THE RELATED FAMILY ENTITIES

10.     Sports Technology Group ("STG") is a Pennsylvania partnership with offices in Pittsburgh, PA. STG is currently owned by the Estate of Velma Ferrari (49.04%), the Velma Ferrari Marital Trust (49.03%), and Ron Carr (1.93%). In 2020, Matthew purported to purchase Ron Carr's STG shares, but the transaction was invalid because his claimed power of attorney was invalid. STG owns the land and warehouse used by the Company and leases such property to the Company.

11.     Almat Brokerage, L.P. ("ABL") is a Pennsylvania partnership with offices in Pittsburgh, PA. ABL was formed on December 24, 1998. ABL is owned by Matthew (47.05%), Alex (47.05%), the Estate of Velma Ferrari (2%), and the Company (1%). The Company serves as ABL's general partner.

12.     Various trusts were created by the Wills of Harry Ferrari (Date of death 8/3/16) and his wife Velma Ferrari (Date of death 4/6/20): 1) Velma F. Ferrari Marital Trust ("VF Marital Trust"); 2) Harry M. Ferrari Family Trust ("HF Family Trust"); and 3) the Velma F. Ferrari Family Trust ("VF Family Trust") (collectively, the "Family Trusts"). Alex asserts no claims in this action regarding the creation or administration of the Family Trusts, although certain transactions alleged herein involve such trusts.

13.     Upon the death of Harry on 8/3/16, his estate was created (the "Harry Ferrari Estate"), and upon the death of Velma Ferrari on 4/6/20, her estate was created (the "Velma Ferrari Estate"). Alex asserts no claims in this action regarding the creation or administration of these Estates.

14.     Collectively, STG, ABL, the Family Trusts, the Harry Ferrari Estate, and the Velma Ferrari Estate are referred to herein as the "Related Family Entities".

## JURISDICTION

15.     This Court has original jurisdiction over this action based upon 28 U.S.C. §

1332(a). There is diversity of citizenship of the parties and the matter in controversy exceeds

$75,000, exclusive of interest and costs.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because, among

other things, a substantial part of the events giving rise to the claims arose in the Western District

of Pennsylvania, and Defendant is subject to personal jurisdiction in this District.

## FACTUAL BACKGROUND

A.     **Operation of the Company While Harry Was Alive and In Control of the Company; Harry Resists Matthew's Attempts to Seize Control of the Company, Unreasonably Increase His Salary and Benefits and Make Unilateral Decisions Concerning Material Company Transactions**

17.     Until his death in 2016, Harry oversaw the Company's operations and corporate

meetings, including directors and shareholders meetings. As the founder and/or controlling

shareholder of the Company (until sufficient shares were transferred to Matthew and Alex),

Harry controlled all aspects of the Company, including the compensation and benefits paid to

Matthew and Alex.

18.     While Harry was alive, Matthew made repeated attempts to increase his salary,

bonus, and benefits to higher levels, but Harry strongly resisted and imposed reasonable limits on

Matthew's compensation and benefits commensurate with the performance of the Company and

how similarly situated CEOs in similar companies were paid.

19.     In 2013, Matthew requested a $240,000 salary plus 66% of the Company's net

profits for his compensation, but Harry rejected this request and in support cited to an AICPA

website, which listed the average salary and bonus for CEOs of companies with $14 Million in

sales (similar to the Company at that time) at $156,000 plus a $20,000 bonus.

20.     In late 2015, Harry again set the reasonable parameters for Matthew's salary and bonus, stating in a 9/26/15 email: "I believe the salary should be in the $100-120K range and a bonus of 30% at the $100K salary and 25% at the 120K salary as possible figures."

21.     In 2015, Matthew attempted to pack the Board of Directors with friends and acquaintances who would support him and his plan to take control of the Company and increase his compensation and benefits despite Harry and Alex's opposition, but Harry prevented the attempted Board expansion and limited the role of the new "directors" to "advisory" directors only. After a couple of years of Directors meetings with the "advisory" directors, in approximately 2017 the Board went back to meeting with only the real directors, which by then was limited to Matthew and Alex.

22.     While Harry was alive, he caused the Company to have regular Shareholders and Directors meetings, in compliance with applicable corporate law and the Company's Bylaws, which require an annual meeting of Shareholders and regular meetings of the Directors. At such meetings while Harry was alive, the Shareholders routinely reviewed and discussed all material transactions involving the Company, including but not limited to: results of operations; forecasts and budgets; loans and borrowings; corporate opportunities; employee compensation and benefits; and officer compensation and benefits. The established policy and practice of the Company was to require review and approval by the Shareholders and Directors of all such matters, and not permit any single Officer to approve such transactions on his own, as evidenced in part by Article 4.1 of the Bylaws, which vests the "management of all the affairs, property and interest of the corporation" in the Board of Directors. The President/COO of the Company has never had the implied or apparent authority to approve material transactions on his own.

23.     In 2015, after Matthew began making unilateral decisions about material transactions involving the Company because he knew the Board would not approve of them, Harry put his foot down and demanded that all material transactions be reviewed and approved by the Board consistent with the Bylaws. In a 9/26/15 email, Harry advised Matthew and Alex: "Matt has unilaterally made some important decisions, acting as though he were sole shareholder, which should have gone to the board, but, he knew that we probably would not have approved them...." Harry goes on to say that "Board approval [is] required for any operation or agreement worth over $100,000, and all firing, and hiring of professional personnel."

24.     Exasperated with Matthew's multiple attempts to increase his compensation and benefits and avoid Board review and approval of material transactions involving the Company, Harry advised both Matthew and Alex in the 9/26/15 email: "If Matt wasn't my son and Alex's brother, he would have been fired a long time ago."

25.     Unable to circumvent his father while he was alive, Matthew was forced to wait until after Harry and Velma died to get what he wanted, which was to treat the Company as his own.

26.     With a parent's prescience and concern based upon years of experience, several months before he died Harry addressed a letter to Matthew and Alex in which he referred to the importance of the Company and stated to Matthew: "Please make sure that Alex is treated fairly." Unfortunately, Harry's near-death request fell on deaf ears, as did Harry's request that Matthew live up to an agreement to split the ownership of a related company (ABL) 50-50 between them.

27.     The minutes of the Shareholders and Board of Directors meetings of the Company prior to Harry's death reflect that the Shareholders and Directors reviewed and approved all material transactions, including loans, employees' and Officers' salary and bonuses, and

distributions to shareholders, and the President/COO of the Company was not authorized to review and approve material transactions on his own.

28.     The minutes of the only two Shareholders and Board of Directors meetings of the Company after Harry's death reflect that in those meetings the Shareholders and Directors continued to review and approve material transactions. However, as described below, Matthew caused the Company to stop having regular annual meetings of the Shareholders and Directors in order to keep information from Alex and to allow Matthew to make unilateral decisions about the Company without Alex's knowledge or approval and sometimes over Alex's express objections. This was part of Matthew's wrongful oppression and squeeze-out of Alex and breach of his fiduciary duties to Alex and the Company.

**B.      After Velma's Death in 2020, Matthew Takes Unilateral and Unauthorized Actions to Dramatically Increase His Compensation and Benefits and Take Total Control of the Company by Oppressing and Squeezing-Out Alex, Including Terminating His Employment and Benefits and Terminating Distributions from the Company**

29.     Soon after Velma died in early 2020, and after years of Harry rejecting Matthew's efforts to unreasonably increase his compensation and benefits, Matthew embarked on a campaign to dramatically and excessively increase his compensation and benefits and take complete control of the Company by oppressing and squeezing-out Alex.

30.     Matthew's excessive compensation began in 2020 and has continued through to the present, and such compensation was taken without Alex's knowledge and/or approval, contrary to how the Company and Board operated prior to 2020 as described above and exceeded Matthew's authority.

31.     While his parents were alive, Matthew's compensation and benefits were limited to reasonable amounts. However, once both parents were deceased, Matthew's compensation skyrocketed to excessive and unreasonable amounts, as summarized in the following Table:

|  | Matthew's Total Compensation | Matthew's Country Club Dues | Company Income or Loss |
|---|---|---|---|
| 2016 | $149,017 | $15,869 | -$13,618 LOSS |
| 2017 | $154,599 | $28,754 | -$26,772 LOSS |
| 2018 | $176,840 | $13,836 | -$185,356 LOSS |
| 2019 | $195,255 | $62,157 | $54,706 INCOME |
| 2020 | $220,257 | $29,834 | $67,480 INCOME |
| 2021 | $306,335 | $94,249 | $483,848 INCOME |
| 2022 | $562,537 | $33,056 | $1,394 INCOME |
|  |  |  |  |
| Totals: | $1,764,840 | $277,755 |  |

The above amounts do not include health insurance and other benefits provided to Matthew and his family. Matthew's 2016-2022 compensation and County Club dues alone total $2,042,595. As shown in the above Table, Matthew's compensation in 2022 substantially eliminated the Company's entire profit for the year, leaving nothing to distribute to Alex.

From February 2020 to April 2023, Matthew caused the Company to pay over $167,000 in country club expenses, an average of over $4,400 per month, to the Pittsburgh Golf Club (near his home), the Rolling Rock Club, and the Duquesne Club, including a $51,000 initiation fee to the Rolling Rock Club in June 2021. Alex was not advised of these lavish expenses and never approved of them. Matthew intentionally did not present these expenses to Alex or the Board for review and approval because he knew they would never be approved.

32.     In stark contrast to Matthew's $2 Million+ 2016-2022 compensation and benefits, Alex received only a small amount from the Company in the same time period as summarized in the following Table:

|  | Alex's Total Compensation | Alex's Country Club Dues | Company Income or Loss |
|---|---|---|---|
| 2016 | $12,892 | $0 | -$13,618 LOSS |
| 2017 | $19,579 | $0 | -$26,772 LOSS |
| 2018 | $19,248 | $0 | -$185,356 LOSS |
| 2019 | $20,000 | $0 | $54,706 INCOME |
| 2020 | $20,000 | $0 | $67,480 INCOME |
| 2021 | $0 | $0 | $483,848 INCOME |
| 2022 | $0 | $0 | $1,394 INCOME |
| Totals | $91,719 | $0 |  |

In 2017 Matthew cancelled Alex's family's healthcare coverage through the Company claiming that it was too expensive. In December 2020, Matthew terminated Alex's employment and retirement benefits with the Company, claiming that such benefits could not continue even though Matthew was secretly increasing his own salary and spending lavishly at local country clubs, and at that time stated that he "would not take any increase in base pay" after Alex's termination. Matthew's representation about not increasing his base pay after Alex's termination was false, as evidenced by his actual compensation and benefits described above.

In order to further assure that Alex receives little if anything from the Company, Matthew secretly raised the compensation of certain employees to levels well in excess of reasonable amounts commensurate with their historical compensation and benefits, positions and duties, and the average amounts paid by comparable companies to comparable employees. Alex and the Board were not informed of these compensation amounts and did not approve of them, and such compensation exceeded Matthew's authority. The excessive amounts improperly paid to these employees represent amounts diverted from profits and, ultimately, distributions to shareholders including Alex.

33.     As part of his oppression and squeeze-out of Alex, Matthew also substantially cut-off all distributions to the shareholders, including tax distributions needed to pay taxes on Subchapter S income allocated to the Shareholders. From 2016-2022, the Company made only

one distribution, in 2021 in the total amount of $150,000 ($75,711 to Matthew and $74,289 to Alex) for estimated taxes on allocable 2020 Subchapter S income. No other distributions were made despite Matthew's promises to make such distributions and Alex's requests for such distributions. Matthew expressly reneged on a promise to cause the Company to make a tax distribution of $150,000 in March of 2022 so that Alex could pay the taxes incurred on 2021 Subchapter S income allocated to him. By refusing to make tax distributions, Matthew is intentionally causing Alex to have to pay income taxes on income allocated to him from the Company so that Alex's ownership is a financial burden.

34.     Matthew's excessive compensation and benefits from 2020 to the present, and the excessive amounts secretly paid to select employees in 2021-2022, and his nearly-complete cessation of distributions to Shareholders, were wrongfully oppressive to Alex and designed to ensure that Alex receives little or nothing from the Company and has to pay taxes on allocated but undistributed income with his personal funds. The message to Alex was clear: he should expect nothing from the Company and should plan to use his personal funds to pay taxes on income allocated but not received.

C.     **Matthew Causes the Cessation of Regular Annual Shareholders and Directors Meetings After Harry's Death in 2016 as Part of His Plan to Oppress and Squeeze-Out Alex; Alex Is Forced to Call Special Meetings in December 2022**

35.     As part of his plan to take complete control of the Company and wrongfully oppress and squeeze-out Alex, including preventing him from meaningfully participating in the Company's affairs, Matthew caused the Company to stop having regular annual Shareholders and Directors meetings after Harry died in 2016, with the limited exception of meetings in 2016 and 2021. By refusing to have such meetings, Matthew intended to prevent Alex from knowing about material transactions involving the Company because he knew Alex would not approve

them. For example, Matthew caused the Company's advertising expense to skyrocket to $1.5 Million per year, over $1 Million more than its historical averages, without consulting Alex or getting Board approval.

36.     From 2016 until the present, Matthew has caused the Company to skip most annual meetings of Shareholders and Board of Directors except for meetings called in 2016 and 2021 as follows:

a.  2016: Annual Shareholders Meeting on 12/13/16 and annual Board of Directors Meeting on 12/14/16;

b.  2017: No Shareholders or Directors meetings;

c.  2018: No Shareholders or Directors meetings;

d.  2019: No Shareholders or Directors meetings;

e.  2020: No Shareholders or Directors meetings;

f.  2021: Annual Shareholders Meeting and Annual Directors Meeting on 11/18/21;

g.  2022: No Annual Shareholders or Directors meetings, but Special Meetings of Shareholders and Directors, called by Alex, occurred on 12/30/22; and

h.  2023: No Shareholders of Directors meetings to date.

37.     At the 2016 and 2021 meetings described above, the Shareholders and Directors reviewed and approved certain material transactions including compensation, bonuses, profit and tax distributions, equipment purchases, and financial projections consistent with historical practices. At the 2016 meetings, it was decided that no bonuses would be paid to any employees and no distributions to the shareholders would be made since the Company experienced a Loss for the year. At the 2021 meetings, it was decided that bonuses would be paid as per the budget (with no discussion of specific amounts payable to any employee including Matthew) and tax

distributions would be made to the Shareholders to cover their taxes on allocated profits. Alex expected that the 2021 bonuses would not result in excessive compensation to Matthew and any other employee.

38.     After it became apparent that Matthew was going to again skip the regular annual meetings of the Shareholders and Directors for 2022 (as he did from 2017-2020) and was simultaneously resisting Alex's requests for information and records of the Company, in December 2022 Alex scheduled and noticed Special Meetings of the Shareholders and Directors. Matthew was not pleased and exploded in rage at Alex and initially refused to attend the meetings.

39.     After receiving Alex's 12/20/22 Notices of a Special Meeting of the Shareholders and a Special Meeting of the Board of Directors, Matthew sent the following text message to Alex:



In another text message on the same day, Matthew also questioned why Alex would

retain counsel: "[W]hy you would have engaged him in the first place is highly unusual."

40.    After initially strongly resisting the Special Meetings called by Alex, Matthew

relented and reluctantly attended such meetings with his counsel.

41.    During the December 30, 2022 Special Meetings, Alex and his counsel asked

questions about the Company and its operations including large loans to the Company, business

opportunities available to the Company, Alex's recent request for information and records, and a possible buyout of Alex's interests. Alex and Matthew disagreed on many issues, including whether Matthew had unilateral authorization to take out large loans without Alex and the Board's review and approval and over Alex's objections. In addition, at such meetings, Matthew claimed to not know what his current salary was and what his expected 2022 bonus would be, and further claimed that Harry had approved the "formula" for calculating his bonus, but such method and formula was never presented to or approved by the Board. When Alex requested that all compensation and bonuses for Matthew be reviewed and approved by the Board, Matthew responded that he was not sure what his reaction to that request was. Matthew failed to disclose that he was arranging to award himself a bonus so large that it would wipe out the Company's profits for the year, leaving nothing to distribute to Alex.

42.    When Alex prepared and circulated minutes for the December 30, 2022, Special Meetings, Matthew refused to approve them or even provide any suggested modifications.

43.    As of the filing of this Complaint, Matthew has continued to refuse to call and hold regular meetings of the Shareholders and Directors.

**D.    Matthew Causes the Company to Take Out Massive Multi-Million Dollar Loans to Fund His and Select Employees' Excessive Salaries and Benefits Over Alex's Express Objections**

44.    As part of his wrongful oppression and squeeze-out of Alex, and to provide the necessary funds to pay his and his selected employees' excessive compensation and benefits, Matthew caused the Company to borrow millions of dollars from the Related Family Entities and to open up a $2 Million line of credit with Citizens Bank. Matthew caused the Company's assets to be pledged as security over and over again in connection with these loans.

45.     Alex objected to the loans that Matthew caused to be taken out, in part because the Company was already in significant debt and Matthew's Wrongful Conduct would impede the Company's ability to repay them, but Matthew ignored him. Matthew failed to present the loans to the Board of Directors for review and approval, contrary to the Company's Bylaws and past practices, and the loans exceeded Matthew's authority. In addition, Matthew failed to obtain the necessary approval of the Related Family Entities that made the loans and simply took the funds from the bank accounts of such entities.

46.     Matthew caused the following loans to be taken out by the Company over Alex's objection and without Board approval, leaving the Company burdened with significant debt that that it will struggle to repay due to Matthew's Wrongful Conduct:

    a.  12/1/18 $200,000 Loan from STG;

    b.  4/5/21 $175,000 Loan from STG, 4%, Due 4/5/23;

    c.  7/1/21 $1,250,000 Loan from ABL;

    d.  12/2/21 $250,000 Loan from Matthew, 5%, Due 6/15/23;

    e.  1/31/22 $100,000 Loan from ABL, 2%, Due 12/31/24;

    f.  1/20/22 $600,000 Loan from HF Family Trust;

    g.  2/3/22 $750,000 Loan from Matthew, 5%, Due 6/15/23; and

    h.  5/18/22 $2 Million Loan Agreement with Citizens Bank

(collectively, the "Improper Loans"). The Improper Loans total $5,325,000, although the Citizens Bank Loan is a line of credit that can fluctuate and had a balance of $1.1 Million in March 2023. As of 12/31/22, the Company is significantly burdened with long-term debt totaling approximately $5.8 Million, including the Improper Loans and other debt. After learning about some of the Improper Loans, Alex advised Matthew that the amount of debt he caused the

Company to take on "seems unreasonably risky [and] I don't understand why you did that, and I certainly wouldn't have agreed with taking on so much debt had you let me know."

47.     When arranging for the Improper Loans, which in most cases coincides with the excessive compensation referenced above, Matthew set terms for himself that were more favorable than the terms of the loans from the Related Family Entities, which conduct constitutes improper self-dealing. Matthew failed to disclose one or more of the Improper Loans to Alex.

48.     When arranging for the Citizens Bank Loan, Matthew falsely represented to Citizens Bank that the Company's Board had approved the loan. *See* Corporate Resolution To Borrow/Grant Collateral/Subordinate Debt ("Resolutions Adopted. At a meeting of the Directors of the Corporation . . ., duly called and held on May 18, 2022, at which a quorum was present and voting, or by other duly authorized action in lieu of a meeting, the resolutions set forth in this Resolution were adopted."). No such meeting or action in lieu of a meeting actually occurred. In fact, after Matthew advised Alex that Alex's approval was necessary for the loan, Alex advised him that he was against such loan. Matthew did not disclose to Citizens Bank that Alex objected to the loan and the Board did not approve it. Matthew's conduct in connection with this loan is illegal. *See* 18 U.S.C. § 1014 (False Statement to a Bank or Other Federally Insured Institution).

49.     Under Matthew's direction the Company has not repaid most of the principal of the Improper Loans and portions of the interest due through 12/31/22, and it will struggle to repay due to Matthew's Wrongful Conduct. Rather than repay these Loans, Matthew arranged to pay himself and select employees excessive and unauthorized compensation. Alex's multiple requests to Matthew that the Company repay the Improper Loans were rejected.

50.     Alex recently discovered that in March of 2023, Matthew caused the Company to draw $1.1 Million on the Citizens Bank Loan and use $200,000 of such proceeds to pay back a

loan due to Matthew instead of earlier loans due to the Related Family Entities. This constitutes improper self-dealing by Matthew.

51.     The Improper Loans and the Company's substantial non-repayment to date significantly and improperly diminishes the value of the Company and Alex's minority shares.

**E.      Matthew Wrongfully Resists Alex's Requests for Information about the Company and Company Records and Causes Company Records to become "Inaccessible"**

52.     Beginning in or about March of 2022, Alex began requesting information about the Company and Company records. In connection with these requests, Alex highlighted the fact that he is a substantial minority Shareholder, Director and Officer of the Company and therefore is entitled to such information.

53.     Matthew wrongfully resisted and delayed responding to Alex's multiple requests for information and records, claiming Company employees were too busy to respond, and then provided only selected records. Matthew significantly delayed the production of requested general ledgers of the Company that disclose all transactions of the Company including his compensation and benefits.

54.     Despite Matthew's and the Company's legal obligations to keep and provide prompt access to books and records upon the request of shareholders, directors, and/or officers, Matthew has recently advised Alex that important records prior to 2020 are now "inaccessible" and therefore cannot be produced. Many of these missing records would provide further substantiation of Matthew's Wrongful Conduct.

55.     Matthew's failure to provide prompt access to important Company information and records is wrongful and a key component of his oppression and squeeze-out of Alex.

56.     Due to Matthew's misconduct related to the Company's books and records, Alex was prevented from discovering much of the Wrongful Conduct until recently despite Alex's reasonable diligence with respect to trying to get access to the necessary information.

**F.      Matthew Attempts to Divert the Company's Business Opportunities**

57.     As part of his wrongful oppression and squeeze-out of Alex, Matthew has attempted to divert the Company's business opportunities, including the creation of a pickleball court business that would use Company employees to operate.

58.     Matthew has a fiduciary duty to not divert the Company's business opportunities for his own personal gain.

59.     Alex has objected to the diversion of the Company's business opportunities and the use of Company employees in such ventures, but Matthew claims the Company cannot afford it. If the Company cannot afford such opportunities, it is because of Matthew's and his favorite employees' excessive compensation and benefits. But for Matthew's Wrongful Conduct, the Company would be in a position to take advantage of these opportunities.

**G.      Matthew's Fiduciary Duties Owed to Alex Including His Duty to Not Oppress Alex**

60.     As the majority controlling shareholder and Director and Officer of the Company, Matthew owes fiduciary duties to Alex, including the duty to not use his controlling power in such a way as to exclude Alex from his proper share of the benefits of the Company and to act in the best interests of all Shareholders including Alex. *See, e.g., Murphy v. Inman*, 509 Mich. 132, 147-48 (2022); *Veeser v. Robinson Hotel Co.*, 275 Mich. 133, 138 (1936) ("The law requires of the majority shareholders of a corporation the utmost good faith in the control and management of the corporation as to the minority and it is the essence of this trust that it must be so managed as to produce to each stockholder the best possible return upon his investment."). Matthew's

fiduciary duties to Alex include the duties of due care, loyalty and good faith, a duty of candor

and full disclosure regarding material transactions, and a fiduciary duty to produce to each

shareholder the best possible return on his investment, *see Murphy,* 509 Mich. at 148, and a

fiduciary obligation to not divert the Company's business opportunities, *see Production*

*Finishing Corp. v. Shields*, 158 Mich. App. 479, 485 (1987) and *Emmet v. Franco*, 2017 U.S.

Dist. Lexis 24226 at *22-23 (E.D. Mich. Feb. 22, 2017) (direct action by shareholder permitted)

(collectively, "Matthew's Fiduciary Duties").

61.     Matthew's Fiduciary Duties impose a high standard of fiduciary responsibility, a

standard more akin to partnership law. *E.g., Estes v. Idea Engineering & Fabrications, Inc.*, 250

Mich. App. 270, 281 (2002).

62.     Matthew was further obligated to not commit acts that are "illegal, fraudulent, or

willfully unfair and oppressive" to the Company and/or Alex. *See* Section 1489. Such acts

include the Wrongful Conduct. Section 1489 is designed to provide "unique" relief for

shareholders of closely held companies who are owed the strictest of fiduciary duties by those in

control of the corporation, akin to those owed in a partnership. *Estes,* 250 Mich App at 280-81.

Alex has a direct action against Matthew under the Oppression Statute as well as the common

law.

**H.     Legal and Equitable Remedies Available and Sought by Alex**

63.     The Oppression Statute "creates a statutory cause of action along with flexible

discretionary remedies to shareholders of closely held corporations. Moreover, it is clear that this

statutory cause of action for "oppression" in favor of minority shareholders who are abused by

"controlling" persons, is a direct cause of action, not derivative, and though similar to a

common-law shareholder equitable action, provides a separate, independent, and statutory basis for a cause of action. *Estes*, 250 Mich. App. at 278.

64.     Section 1489 provides broad discretion to the Court to fashion appropriate remedies "it considers appropriate, including, without limitation, an order providing for any of the following:

(a) The dissolution and liquidation of the assets and business of the corporation.

(b) The cancellation or alteration of a provision contained in the articles of incorporation, an amendment of the articles of incorporation, or the bylaws of the corporation.

(c) The cancellation, alteration, or injunction against a resolution or other act of the corporation.

(d) The direction or prohibition of an act of the corporation or of shareholders, directors, officers, or other persons party to the action.

(e) The purchase at fair value of the shares of a shareholder, either by the corporation or by the officers, directors, or other shareholders responsible for the wrongful acts.

(f) An award of damages to the corporation or a shareholder. . . .

65.     As a result of Matthew's Wrongful Conduct, Alex seeks the following legal and/or equitable relief under Section 1489 and the common law:

a.   The purchase of his minority shares at fair value by either Matthew or the Company, with appropriate adjustments for the Wrongful Conduct;

b.   A permanent injunction, which orders:

   i.   The reinstatement of Alex's employment and benefits with the Company;

   ii.   Compliance with the Bylaws, including the holding of regular annual directors and shareholders meetings appropriately memorialized in approved minutes and

the submission of all material transactions to the Board of Directors for review and approval including loans, agreements, and compensation of Officers and select employees;

iii.   Reinstatement of tax and other distributions to the shareholders when the Company has sufficient cash flow;

iv.   Adjustment of Matthew's and select employees' compensation and benefits down to reasonable, non-excessive levels consistent with historical practices prior to the Wrongful Conduct;

v.   Prohibiting any further loans or borrowing by the Company without full Board of Directors' review and approval;

vi.   Prohibiting Matthew from causing the Company to repay him before other creditors;

vii.   Prohibiting self-dealing and/or the diversion of the Company's opportunities to any Officer or entity owned in whole or in part by any Officer or Director and the disgorgement of any profits realized as a result of such diversion;

viii.   Alex shall be entitled to full and immediate access to any records of the Company upon request;

ix.   An accounting of the Company's financial transactions including for the time periods for which records are now allegedly "inaccessible"; and

x.   Such other equitable relief as the Court deems appropriate; and

c.   Awarding damages to Alex and/or the Company for:

i.   Matthew's excessive compensation and benefits, totaling approximately $362,536 in excessive compensation through December 31, 2022 plus excessive

compensation thereafter, and excessive benefits totaling $277,755 through December 31, 2022 plus excessive benefits thereafter;

ii.    Select employees' excessive compensation and benefits paid to date;

iii.   Alex's past lost compensation and benefits totaling approximately $50,000 for lost past wages, $132,000 for past lost healthcare benefits, and $2,500 for past lost 401K benefits;

iv.   Amounts realized from unfair, self-dealing transaction with the Company, including excessive interest charged on loans;

v.    Interest paid or incurred on the Improper Loans and the diminished value of the Company due to the Improper Loans and other Wrongful Conduct;

vi.   Punitive damages resulting from Matthew's outrageous, willful, and malicious conduct;

vii.  An award of pre- and post-judgment interest, costs and attorney's fees; and

viii. Such other damages and relief as the Court deems appropriate

(collectively, the "Requested Remedies").

## COUNT I
## MINORITY SHAREHOLDER OPPRESSION UNDER THE OPPRESSION STATUTE

66.    Plaintiff incorporates the previous paragraphs of this Complaint as if they were fully set forth herein.

67.    By committing the Wrongful Conduct, Matthew has violated the Oppression Statute.

68.    As a result of such violation, Alex is entitled to the Requested Remedies.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in his favor and enter an appropriate order for the Requested Remedies.

## COUNT II
## BREACH OF FIDUCIARY DUTIES

69.     Plaintiff incorporates the previous paragraphs of this Complaint as if they were fully set forth herein.

70.     By committing the Wrongful Conduct, Matthew has breached Matthew's Fiduciary Duties.

71.     As a result of such breaches, Alex has suffered harm and damages and is entitled to the Requested Remedies.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in his favor and enter an appropriate order for the Requested Remedies.

## COUNT III
## UNJUST ENRICHMENT

72.     Plaintiff incorporates the previous paragraphs of this Complaint as if they were fully set forth herein.

73.     By committing the Wrongful Conduct, Matthew took benefits from Alex and has been unjustly enriched.

74.     As a result of such unjust enrichment, Alex has suffered harm and damages and is entitled to the Requested Remedies from Matthew including the payment of all wrongfully obtained benefits.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in his favor and enter an appropriate order for the Requested Remedies.

Date: August 25, 2023

Respectfully submitted,

*/s/ Robert M. Barnes*
Bernard D. Marcus (PA ID No. 01293)
Robert M. Barnes (PA ID No. 58655)
MARCUS & SHAPIRA LLP
301 Grant Street
One Oxford Centre, 35th Floor
Pittsburgh, PA 15219-6401
Telephone: 412-471-3490
Facsimile: 412-391-8758
Email: marcus@marcus-shapira.com
Email: rbarnes@marcus-shapira.com

*Counsel for Plaintiff Alex Ferrari*